FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★  MAR 1 2 2008  ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,                  :

                v.                 :    08-CR-66 (FB)

                              :    February 7, 2008
KENNETH ENG,                               :    Brooklyn, New York

               Defendant.          :

------------------------------X


TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Government:          UNITED STATES ATTORNEY
                             BY:  CARTER BURWELL, ESQ.
                             ASSISTANT U.S. ATTORNEY



For the Defendant:           JOEL DRANOVE, ESQ.



Court Transcriber:           MARY GRECO
                             TypeWrite Word Processing Service
                             356 Eltingville Boulevard
                             Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

I N D E X

Defendant Sworn at Page 4

| EXHIBITS | Marked | Received |
|---|---|---|
| 1    Plea Agreement | -- | 11 |

3

THE COURT:  Good afternoon.

THE CLERK:  Criminal Cause for Pleading in case number 08-CR-66. Please state your appearances for the record.

MR. BURWELL:  Carter Burwell for the Government. Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. DRANOVE:  Joel Dranove for Mr. Eng.  Dranove is spelled D-R-A-N-O-V-E.  Good afternoon, Judge.

THE COURT:  Good afternoon.  All right.  This is an information.

Mr. Eng, good afternoon.

THE DEFENDANT:  Good afternoon.

THE COURT:  The first matter we need to take up is the issue of your waiver of indictment.  As I'm sure Mr. Dranove has explained to you, you have a right to have the charges against you presented to a Grand Jury and for a Grand Jury to decide by a vote whether there's sufficient evidence to charge you.  If they decided there was, they would charge you in a document called an indictment.  When you waive indictment, you give up the right to have the Grand Jury consider the charges against you and you agree in this case to let the United States Attorney's Office charge you.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Is it your wish to give up your right to

4

indictment?

THE DEFENDANT:  Yes.

THE COURT:  Did you sign this waiver form today, Mr. Eng?

THE DEFENDANT:  Yes, I did.

THE COURT:  Okay.  All right.  I will accept the waiver.

I understand that you are here to enter a plea of guilty to an information; is that right?

THE DEFENDANT:  Yes.

THE COURT:  You've reviewed the information with your attorney?

THE DEFENDANT:  Yes, I have.

THE COURT:  All right.  As we go through this plea proceeding I need to ask you a series of questions.  These are important questions and you need to make sure that you understand my questions completely because when you answer my questions you will be under oath, and that means if you give a false answer to any of my questions, you could be charged with an additional crime which is the crime of perjury or making a false statement when you're under oath.  Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  Okay.  Would you swear Mr. Eng?

THE CLERK:  Please raise your right hand.

(AT THIS TIME THE DEFENDANT, KENNETH ENG, WAS SWORN.)

THE COURT:  Mr. Eng, you can put your hand down.  Mr. Eng, Judge Block, who will be the Judge who will be sentencing you if your plea is accepted, has asked me, Magistrate Azrack, to hear your plea.  I cannot hear your plea without your consent, and you're free to withhold that consent and insist that Judge Block hear your plea.  So my question to you is do you consent to me, Judge Azrack, hearing your plea?

THE DEFENDANT:  Yes.

THE COURT:  All right.  We'll start with the questions.  What is your full name?

THE DEFENDANT:  My full name is Kenneth Eng.

THE COURT:  How old are you?

THE DEFENDANT:  I'm 24 years old.

THE COURT:  How far did you go in school?

THE DEFENDANT:  I have a Bachelor's Degree in Film and Television from NYU School of the Arts.

THE COURT:  Are you presently under the care of any doctors of any kind?

THE DEFENDANT:  Yes, I'm currently attending an outpatient treatment program at Elmhurst Hospital.  I attend every day.  I take medications every day.

THE COURT:  Okay.  What medications do you take on a daily basis?  Or which medications did you take today or yesterday?

6

THE DEFENDANT:  Abilify.

THE COURT:  Abilify is a --

MR. DRANOVE:  According to what I read on the internet --

THE COURT:  That's where --

MR. DRANOVE:  -- it's a drug for treatment --

THE COURT:  -- we all get our medication these days it appears.

MR. DRANOVE:  Well, but I don't prescribe or diagnose.

THE COURT:  Okay.

MR. DRANOVE:  Or verify what I read.  It's a drug administered to elderly people to diminish the symptoms and rate of -- [inaudible] symptoms of schizophrenia -- I'm sorry, of Alzheimer's.  With younger people it is a treatment for antipsychotic and/or anti-schizophrenic, anti-manic depressive medication.

THE COURT:  Is that the only prescription medication you are taking?

THE DEFENDANT:  As of now, yes.

THE COURT:  Okay.  When was the last time you took other prescription medication?

THE DEFENDANT:  A few months ago I took Resperidol.

THE COURT:  Now you're just taking Abilify?

THE DEFENDANT:  Yes.

THE COURT:  Have you had **any** other pills or alcohol, or any other kinds of medicine in the past 24 hours?

THE DEFENDANT:  No, I have not.

THE COURT:  Have you ever **been** treated for a drug addiction?

THE DEFENDANT:  No, I have not.

THE COURT:  Are you able to think clearly today?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand what's going on here today?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any other inquiry you want me to make with regard to Mr. Eng's medical condition?

MR. BURWELL:  No, Your Honor.  We've inquired of Queens and also Pretrial Services and **everyone** is very comfortable to proceed.

THE COURT:  Okay.  Mr. Dranove, have you discussed this matter with Mr. Eng?

MR. DRANOVE:  I have, Your Honor.

THE COURT:  In your view, **is** he capable of understanding the nature of these proceedings?

MR. DRANOVE:  I have the **firm** opinion that he is capable of understanding the nature of the these proceedings and has consistently been capable and understanding the nature of these proceedings.

8

THE COURT: Okay. Do you believe that he understands the rights he'll be waiving by pleading guilty?

MR. DRANOVE: I have explained them to him and I believe he has. I am certain Your Honor will inquire as well.

THE COURT: Do you have any doubts at all about Mr. Eng's competence to plead today?

MR. DRANOVE: I do not.

THE COURT: Did you advise Mr. Eng of the maximum sentence that could be imposed?

MR. DRANOVE: I have, Your Honor.

THE COURT: Did you discuss all penalties with him?

MR. DRANOVE: I have, Your Honor.

THE COURT: As well as the sentencing guidelines?

MR. DRANOVE: I have, Your Honor, and the most recent decisions of the United States Supreme Court with respect to the guidelines and decisions over the last year or two, the Supreme Court out of the Second Circuit. Yes, Your Honor.

THE COURT: You've been well educated then, Mr. Eng, on those issues?

THE DEFENDANT: Yes, I have.

MR. DRANOVE: Thank you for allowing us to consult.

THE COURT: Mr. Eng, have you had enough time to discuss your case with Mr. Dranove?

THE DEFENDANT: Yes, I have.

THE COURT: Are you satisfied to have Mr. Dranove

represent you?

THE DEFENDANT:  Yes.

THE COURT:  Have you received a copy of the charges which are contained in the information?

THE DEFENDANT:  Yes.

THE COURT:  Did you read them?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that in the one count information that has been filed, you're charged with in or about March of 2005 within the Eastern District of New York and elsewhere, you knowingly and intentionally transmitted in interstate commerce a communication containing a threat to injure the person of another to wit John Doe number one, a person whose identify is known to the United States Attorney? Do you understand those charges?

THE DEFENDANT:  Yes.

THE COURT:  Have you discussed those charges with Mr. Dranove?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Eng, you have a right to plead not guilty to these charges.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If you plead not guilty, under our constitution you are entitled to a speedy, public trial by a jury with Mr. Dranove's  assistance.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  At your trial you would be presumed innocent and the Government would have to overcome that presumption, and the Government would have to prove your guilt by competent evidence and beyond a reasonable doubt.  You would not have to prove that you were innocent.  If at the trial the Government failed to meet their burden of proving your guilt beyond a reasonable doubt, the jury would then have the duty to find you not guilty.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  If you went to trial, Mr. Eng, at trial witnesses for the Government would come to Court and they would testify before you, and your lawyer would have a right to cross examine those witnesses, and he could object to evidence offered by the Government, and he could offer evidence for you. Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  In addition, at trial, while you would have a right to testify if you chose to, no one could force you to take the witness stand.  That's because under our constitution a defendant in a criminal case cannot be forced to be a witness against himself.  So, if you went to trial on this charge but you decided you didn't want to testify at your trial, Judge Block would actually instruct the jury that they couldn't hold the fact that you hadn't testified against you.

11

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now, if you plead guilty and your plea is accepted, you're going to be giving up your right to this trial.  There will be no trial of any kind.  Instead, the Court will simply enter a judgment of guilty based on your guilty plea here today.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  In addition, if you plead guilty, I have to ask you questions about what you did because I have to be satisfied that you really are guilty of this charge.  You will have to answer my questions and acknowledge your guilt.  When you do that, when you answer my questions and acknowledge your guilt, you will be giving up the right I described a moment ago which is the right not to be a witness against yourself.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Are you willing to give up your right to the trial, Mr. Eng?

THE DEFENDANT:  Yes.

THE COURT:  I have a Plea Agreement before me that's signed by everybody except Mr. Burwell.  I'm going to hand it over.  We'll mark it Court Exhibit 1.

(AT THIS TIME COURT EXHIBIT 1 MARKED)

THE COURT:  Mr. Burwell, would you just hand it to

12

the defendant when you're finished?

Mr. Eng, have you read that --

THE DEFENDANT:  Yes, I have.

THE COURT:  -- Plea Agreement very carefully?

THE DEFENDANT:  Yes, I have.

THE COURT:  After you read it, did you discuss what was in it with Mr. Dranove?

THE DEFENDANT:  Yes, I did.

THE COURT:  After you two had your discussions about the Plea Agreement, did you understand everything in it?

THE DEFENDANT:  Yes.

THE COURT:  Do you agree to the terms that are contained in it?

THE DEFENDANT:  Yes, I do.

THE COURT:  Did you sign it at the end to show your agreement?

THE DEFENDANT:  Yes, I did.

THE COURT:  Is that your signature?

THE DEFENDANT:  It is.

THE COURT:  Has anybody made any promise to you about this case that's not contained in that written Plea Agreement?

THE DEFENDANT:  No.

THE COURT:  Has anyone made any promise to you about what your sentence will be?

THE DEFENDANT:  No.

13

THE COURT:  Would you hand me that back?  Thank you. Mr. Eng, do you understand, Mr. Eng, that there's a maximum 5 year term of imprisonment for this charge?

THE DEFENDANT:  Yes.

THE COURT:  Do you further understand that there's a term of supervised release of up to three years, and supervised release is like a term of probation.  When you're on it, although you're free and at liberty, you're under the supervision of the Probation Department for whatever term of supervised release Judge Block imposes.  So although you're free and at liberty while you're on supervised release, you have to abide by conditions that the Probation Department sets, and those are conditions of your supervised release.  If you violate a condition of your supervised release, depending on how serious the violation is, you could be ordered to prison for up to two additional years.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  There is a fine of up to $250,000.00 that can be imposed.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  There is a mandatory $100.00 special assessment that must be imposed.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Have you and Mr. Dranove discussed the sentencing guidelines?

14

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that the sentencing guidelines used to be mandatory for the Judges to follow, which would have meant Judge Block would have had to follow the guidelines in how he sentenced you.  Now the guidelines are not mandatory but are advisory.  That means that Judge Block in considering how to sentence you will look to the guidelines as one factor along with many other factors before he determines what your sentence should be.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Prior to your sentencing, Mr. Eng, you will have a chance to read a document called a presentence report, and that is prepared by the Probation Department, and it's all about you and the circumstances of the crime, and it will recommend a guideline.  If you think there's anything incorrect in the presentence report, you can challenge what you believe is incorrect at a hearing prior to your sentencing.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Also, in certain limited circumstances, you can appeal your sentence.  I see, however, in Paragraph 4 of your Plea Agreement you've agreed not to appeal your sentence or your conviction if you receive a sentence of 12 months or less.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT: So the only situation which you could appeal would be if you received a sentence of more than 12 months. Do you understand?

THE DEFENDANT: Yes.

THE COURT: Okay. Do you have a guideline estimate, Mr. Burwell?

MR. BURWELL: Your Honor, we do, and it's contained within the agreement.

THE COURT: Sorry.

MR. BURWELL: 6 to 12 months based on a criminal history category one.

THE COURT: Mr. Dranove, your guideline estimate?

MR. DRANOVE: It's the same, that is [inaudible].

THE COURT: Is there anything else in the Plea Agreement you'd like me to review with Mr. Eng?

MR. BURWELL: No, Your Honor.

THE COURT: What about you, Mr. Dranove?

MR. DRANOVE: No, Your Honor. I just want to add that I've had several discussions, lengthy discussions with my client. He's always been attentive, focused on the matters at hand.

THE COURT: Okay. Thank you.

Mr. Eng, do you have any questions you want to ask me about the charge, your rights, or anything else relating to this matter?

16

THE DEFENDANT:  No.

THE COURT:  Are you ready to plead?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Dranove, do you know of any reason why Mr. Eng should not plead guilty?

MR. DRANOVE:  No, Your Honor.

THE COURT:  Mr. Eng, what is your plea to the information; guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  Are you making this plea of guilty voluntarily and of your own free will?

THE DEFENDANT:  Yes.

THE COURT:  Has anybody threatened or forced you to plead guilty?

THE DEFENDANT:  No.

THE COURT:  Has anybody made any promise to you as to what your sentence will be?

THE DEFENDANT:  No.

THE COURT:  Okay.  Describe to me in your own words what you did in or about March of 2005 to commit this crime.

THE DEFENDANT:  I made a phone call to John Doe whose identity is known to me, and based on my prior conduct with him and my prior contact with him, it was my intention to scare him into thinking I was going to injure him.

THE COURT:  What did you say?

17

THE DEFENDANT:  I can't remember exact verbatim, but I think I said something along the lines of, "Remember me?  I'm the guy who spat in your face."

THE COURT:  Is that all you said?

THE DEFENDANT:  I believe so.

THE COURT:  Was this the phone call -- where was this person located?

THE DEFENDANT:  I believe according to the accusation, he was located --

THE COURT:  Well, where did you call him?  What was the --

THE DEFENDANT:  I was calling from Queens.

THE COURT:  Were you calling a cell phone number?

THE DEFENDANT:  I believe it was his cell phone number.

THE COURT:  This was a person that you had had previous interaction with?

THE DEFENDANT:  Yes.

THE COURT:  What was your previous interaction with this person?

THE DEFENDANT:  He was a former student of mine.  He lied to have me thrown out of a class.

THE COURT:  Had you had previously to the phone call had any words with him?

THE DEFENDANT:  Previous to the phone call I had an

18

argument with him.

THE COURT:  Did you have any physical contact with him?

THE DEFENDANT:  I had no physical contact with him.

THE COURT:  When you called him, what was your intention?

THE DEFENDANT:  My intention was to scare him.  I would also like to point out that the security guards were called in during the confrontation which prevented any physical contact.

THE COURT:  That's the confrontation at the school?

THE DEFENDANT:  Yes.

THE COURT:  But when you called him in March of 2005, your intention was to scare him into thinking you were going to injure him?

THE DEFENDANT:  Yes.

THE COURT:  But your words were what?  To the best of your recollection, what did you say?

THE DEFENDANT:  "Remember me?  I'm the guy that spat in your face."

THE COURT:  That was end of your conversation with him?

THE DEFENDANT:  Yes.

THE COURT:  What else, Mr. Burwell?

MR. BURWELL:  Your Honor, we did send you this letter

and it outlines the fact that -- I think I can see that Your Honor was concerned about --

THE COURT: I have real concerns.

MR. BURWELL: I understand. I can discuss with you those more fully. I can provide you more information about what the Government's proof at trial would be.

THE COURT: Well, is the Government's proof at trial somehow in variance with what that allocution was about the telephone call? Because it all hinges on the telephone call, what he said in that telephone call. My concern is that the words that he enunciated in the phone call don't make out the crime. I'm concerned, and I may have to reserve decision, but I'll hear you if the Government has proof that there was something beyond the words that Mr. Eng just allocuted to.

MR. BURWELL: Your Honor, the Second Circuit's test, as we articulated in the letter, is not based on what the words a person communicated. In fact, the Second Circuit is pretty clear that you don't have to have an explicit threat of injury, say for instance a statement, "I'm going to kill you," and instead it's a very contextual analysis. One of the --

THE COURT: It's a contextual analysis but it still must be a true threat.

MR. BURWELL: Absolutely, but I've been --

THE COURT: The words I have, unless there's something beyond what Mr. Eng just allocuted to, I have,

20

"Remember me?  I'm the guy who spat in your face."

MR. BURWELL:  Your Honor, with respect to that true threat analysis, I can point you to specific case law right now to tell you that that true threat analysis that you're referencing is largely devoted towards an analysis of whether or not communication is in fact political speech, whether there is a First Amendment concern.  That form of analysis is not applicable in the case of a direct communication with a large [inaudible] to a specific individual without any political overtones.  It's whether or not a communication is in fact a threat of injury, it is a question for the jury.  It looks to-- there are some very important areas that the Second Circuit says to look to, but first and foremost it's the effect of the threat on the recipient.  Here at trial the Government would show that the individual who received the call felt serious severe fear for his life when Mr. Eng called him 18 months approximately after the first interaction; felt terrified for his life.

We also point out both for specific reasons, you know, as our letter indicates, after -- there's an exchange in the classroom.  Then the defendant pursued that individual, John Doe, approximately a year later, did get into a very threatening interaction with that individual at the NYU campus. During that exchange he made very threatening comments to the victim.  He spat in his face.  Security was called.  The victim

21

demanded to be escorted out of the studio.  The Government would be prepared to show at trial that Mr. Eng told the victim that  he, Mr. Eng, advocated violence against individuals like the victim, that two or three -- that the defendant -- sorry, that the victim was terrified for his life right then.  The victim actually filed a complaint with NYU at which he stated that he was terrified for his life.  Two days later, the victim [sic] again was seen threatening the victim, lurking, according to the Government's proof, outside of the victim's locker at NYU.  The victim again called NYU security and demanded to be escorted out of the campus because at that moment in time he was fearful for his life as a result of his prior exchange with the defendant.

THE COURT:  I'm familiar with all those facts because I'm familiar with the complaint, but those aren't the facts that underlie the charge, the threat itself.  The threat itself, the Second Circuit law is that the threat itself has to be so unequivocal, unconditional, immediate, and specific as to the person threatened.  I have concerns about this.  I'll let you brief it further.  Do you want to be heard, Mr. Dranove?

MR. DRANOVE:  No, Your Honor.  [Inaudible] very interesting [inaudible] on a man who's obviously now being treated for problems and confronted by the power of the United States Government and being made an offer [inaudible] circumstances.  It's the right thing to do.  But I don't really

22

want to -- perhaps in a conference we could talk, Your Honor, about matters with the Government present.  But there's a --

THE COURT:  Well, I'm sure there's history.  I'm going to permit you to make a submission to me and I'll permit the Government to make a further submission, but I'll say for the record now, based on the information given to me I do find that Mr. Eng is acting voluntarily and understands his rights and the consequences of the plea.  My concern in which I'm reserving decision is whether there's an adequate factual basis for the plea.  So I'll reserve decision on that issue and I will look forward to your briefing.  Thank you.

[Off the record.]

THE COURT:  With regard to the bail conditions?

MR. BURWELL:  May I discuss one --

THE COURT:  Yes.

MR. BURWELL:  -- potential alteration --

THE COURT:  Yes.

MR. BURWELL:  -- in the bail condition?

THE COURT:  Yes.

MR. BURWELL:  I think defense counsel will agree.

[Pause in proceedings.]

MR. DRANOVE:  [Inaudible] an order of protection.  No, no, that other case had nothing to do with this.  But I think in this case [inaudible].  Don't talk to John Doe.

THE COURT:  Maybe we should get a copy of the bond.

23

Do you have a copy of the bond.

MR. DRANOVE:  I don't have it with me.

MR. BURWELL:  Your Honor, if I could speak to the agent very quickly?

THE COURT:  Yes, please.

[Pause in proceedings.]

MR. BURWELL:  Your Honor, we don't have the bail condition right now.  I think defense counsel is in agreement we'd like --

MR. DRANOVE:  I'm sure they'd like it.  We have no objection if the client is told to have no contact with John Doe, number one, or whatever.

THE COURT:  Wouldn't that have been a condition of release on the complaint, or was the complaint dismissed?

MR. DRANOVE:  It was not dismissed.

MR. BURWELL:  It was not dismissed.

THE COURT:  Okay.  So the conditions of release that were imposed at Mr. Eng's arraignment on the complaint would still be in place?

MR. BURWELL:  Yes, Your Honor.

THE COURT:  Okay.

MR. BURWELL:  Just not having been the attorney that was originally assigned to the case --

THE COURT:  Okay.  If there isn't a condition -- well, Mr. Eng, a condition of your release is going to be that

24

you have no contact of any kind with John Doe.

THE DEFENDANT:  I understand that.

THE COURT:  Okay.  It means no written contact, no verbal, oral, not even psychic contact with Mr. Doe.  You know who Mr. Doe is; is that right?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Is that clear?

THE DEFENDANT:  Yes.

THE COURT:  Because if you have contact with him, it could be the basis for another criminal charge.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So if this wasn't a condition of your release before, it's a new bail condition today.

THE DEFENDANT:  Okay.

THE COURT:  All right.  Anything else?

MR. BURWELL:  No, Your Honor.  Probably for purposes of my supervisors in the office we ask that this transcript be expedited as quickly as possible so that I can respond to your submission.  I don't know how long that takes but if --

THE COURT:  I'll do my best.  I'll see what -- you know, I'm pretty low on the totem pole, but I'll do my best.

MR. DRANOVE:  Your Honor, may I ask Your Honor to indulge me a moment?

THE COURT:  Yes.

25

MR. DRANOVE:  I believe Your Honor has focused with laser like precision on the question of whether these words alone are sufficient.  Is Your Honor aware of a decision from which Your Honor was perhaps --

MR. BURWELL:  I can give you the case.

MR. DRANOVE:  Well, this letter came --

THE COURT:  Okay.  You know, the Government's letter -- did you give Mr. Dranove a copy of your letter?

MR. DRANOVE:  It came late in the -- very late in the day and part of it [inaudible] fax machine [inaudible].

THE COURT:  The cases that --

MR. DRANOVE:  Mr. Burwell was very helpful in that.

THE COURT:  Yes.  But the cases in the Government's letter are really the cases that we've looked at thus far.

MR. DRANOVE:  All right.

THE COURT:  Kelner [Ph.] is a very important case.

MR. DRANOVE:  Right.

THE COURT:  You know, I'm sure there's a larger universe that I've looked at, but in the short time we had to review it, those were the main cases that we focused on.  The Second Circuit seems to be pretty clear about what a threat needs be in arguing.  Those are my concerns.  I'm sure Mr. Burwell will enlighten me and Mr. Dranove with your submissions.

MR. DRANOVE:  With my background with the Legal Aid

26

Society in Brooklyn, I recall representing many people who were prosecuted for the Class B misdemeanor of aggravated harassment over the telephone which matters were disposed of by a disorderly conduct violation [inaudible].

THE COURT:  Okay.  Thank you.

MR. DRANOVE:  But that was state law.

THE COURT:  Thank you.

MR. BURWELL:  Thank you, Your Honor.

*  *  *  *  *  *

27

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_Mary Greco_
Mary Greco

Dated:   February 23, 2008