UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,     :  08-CR-0066(FB)
                              :
                              :
                              :
     -against-                :  United States Courthouse
                              :  Brooklyn, New York
                              :
                              :
KENNETH ENG,                  :
                              :  Tuesday, September 13, 2011
          Defendant.          :  11:00 a.m.
                              :
                              :
                              :
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF
CRIMINAL CAUSE FOR VIOLATION OF SUPERVISED RELEASE
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    LORETTA E. LYNCH, ESQ.
                       United States Attorney
                       Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                       BY: PAMELA CHEN, ESQ.
                            Assistant United States Attorney

For the Defendant:     JOHN S. YONG, ESQ.
                       Attorney for the Defendant -
                       Kenneth Eng
                            11 East Broadway
                            Suite 9C
                            New York, New York 10038

A P P E A R A N C E S:


UNITED STATES PROBATION DEPARTMENT
Eastern District of New York
75 Clinton Street
Brooklyn, New York 11201
BY: GREGORY CARTER, U.S.P.O.


Court Reporter:   Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                  Official Court Reporter
                  Telephone: (718) 613-2487
                  Facsimile: (718) 613-2694
                  E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

(In open court.)

(Defendant present in open court.)

COURTROOM DEPUTY:  All rise, the United States District Court for the Eastern District of New York is now in session, the Honorable Frederic Block is now presiding.

(Honorable Frederic Block takes the bench.)

COURTROOM DEPUTY:  Calling criminal cause for violation of supervised release in Docket No. 08-CR-0066, *United States of America against Kenneth Eng*.

Counsel, please note your appearances for the record.

MS. CHEN:  For the United States of America, Assistant United States Attorney PAMELA CHEN.

Good morning, your Honor.

MR. YONG: John S. Yong for Kenneth Eng.

Good morning, your Honor.

COURTROOM DEPUTY:  Criminal cause for violation of probation, United States of America versus Kenneth Eng.

Parties step forward and state your appearances.

MS. CHEN:  Pamela Chen for the Government.

MR. YONG:  John Yong, 39 East Broadway for Mr. Kenneth Eng.

MR. CARTER:  Gregory Carter for the U.S. Probation Department.

THE COURT:  Okay.  It's good to see you folks here.  Well, since we were last here, I did receive some information here which I think we should talk about, Mr. Eng.

How are you feeling today?

THE DEFENDANT:  Fine.

THE COURT:  Okay.  And I have a letter from Dr. Ortega who you continue to see, and I asked him to, you know -- let me put this on -- to let me know how you're coming along; it's important that we do that.

You understand that, don't you?

THE DEFENDANT:  Yes.

THE COURT:  Have you seen the letter yet that he wrote to me that's dated August 26th?

THE DEFENDANT:  I have not read it.

THE COURT:  I'm going to read it to you.  You may not be happy with it but in fairness to you, you ought to know what the doctor has written to me.  It should not be kept a secret, okay?

THE DEFENDANT:  Okay.

THE COURT:  So, when I read this you may not be happy with everything but I still have an obligation to you.

THE DEFENDANT:  That's fine.

THE COURT:  And then we got a probation status report, also, which I don't know whether you've seen that or

not.

Has he seen it, Mr. Carter.

MR. CARTER:  I provided a copy to his attorney.

THE COURT:  Okay.  And have you shown it to your client?

MR. YONG:  I have not, Judge.  He began reading it in the beginning of the session and it was my decision, my strategic decision, to have him read it afterwards.

THE COURT:  It's up to you but we have to be open here.

MR. YONG:  Yes.

THE COURT:  I can't keep things in the closet, it's not the right way to go about this.  We have an open relationship but you should show it to him.

But, Mr. Carter, maybe you ought to speak to him first and you can tell me the essence of what you have written to me so Mr. Eng knows where you're at and what your concerns are.  We have to all be open with each other here.

MR. CARTER:  Yes, your Honor.

The Probation Department is extremely concerned based on the report from Dr. Ortega and our continued interactions with Mr. Eng.

As indicated in the report, there was one occasion in which Mr. Eng contacted the therapist, Dr. Ortega, to express what he felt was a homicidal thought.

THE COURT:  It's good that he contacted him.

MR. CARTER:  That is a good thing.

THE COURT:  Yes.

MR. CARTER:  The police were called, responded to Mr. Eng's residence, questioned Mr. Eng and decided he was not a danger to himself or others and did not pursue the matter any further.

I contacted Mr. Eng later that evening, he claimed that the intention was never -- he never really felt that he was going to carry out that intention but the tone again was antagonistic towards Probation, blaming Probation for him losing his job, he was very angry with that whole scene.

His therapy with Dr. Ortega has seemed to deteriorate which is a concern for us.  The last session there was -- it was a very difficult session -- Mr. Eng demanded that his session be changed.

THE COURT:  Is he still on medication?  Is that still happening?

MS. CHEN:  Yes.

THE COURT:  He's taking his medication.

MR. CARTER:  As far as we know.  But the mental health status seems to be deteriorating and that's our concern, whereas before he was engaged in treatment he has seemed to have withdrawn from treatment.

I met with Mr. Eng earlier in my office and the anger seems to be more present now than ever towards Probation and I'm -- and to be quite honest, I am concerned about that whole scene.

Dr. Ortega has recommended a more intensive program. Mr. Eng has indicated he's found another job, he wants to work. My priority, to be honest, is mental health treatment, so if it means increasing treatment, I would rather increase the treatment and make sure that he is stable.

THE COURT: That's what we're trying to do, to give Mr. Eng the best shot of leading a productive life.

Let me read to you what Mr. --

THE DEFENDANT: I would like to add that Officer Carter is lying. I did not demand anything of Dr. Ortega.

THE COURT: I know you have a different view of things and they have different interpretations, I understand that. But let me read to you what Dr. Ortega says. I'm not interacting with you except when we're in court and I have to rely upon the professionals that are in place here, okay?

"This status report was requested by the Court with regards to Mr. Kenneth Eng, who has continued to receive weekly individual psychotherapy with me since May 11, 2010."

And you will recall when we were here last time I did say I want just update from Dr. Ortega.

THE DEFENDANT: Yes.

THE COURT:

"Overall, Mr. Eng, does not present as psychiatrically stable. He has islands of seeming stability that are punctuated by these isolated periods of rabid racism where he becomes fearful of African-Americans. He wants to strike back at perceived injustices and is perceived as antagonistic.

Given the nature of this severe pathology, maintaining an appropriate level of functioning will pose a lifetime challenge for Mr. Eng. He requires much assistance and some supervision to keep his violent fantasies in check.

The content of his recent blogging activity appears to be Mr. Eng's attempt to, "Blow off steam." However, the content of his internet blogging does need to be processed in treatment.

Mr. Eng has a tendency to respond impulsively and he could conceivably get himself into trouble. Should treatment on an outpatient basis continue, Mr. Eng will require consistent redirection and confrontation to assist in reality testing and how

*to apply said techniques when not in a treatment setting. It is the advisory opinion of this clinician that Mr. Eng requires more a intensive level of care such as the kind found in a day treatment program.*

*Should you have any questions, please do not hesitate to contact me."*

That's Dr. Ortega's report, Mr. Eng, and the question, in light of this report, is what should we do and what should you do to be responsive and to try to accept the fact that you have to have some ongoing treatment and help so you can live a productive life. I'm open to suggestions from you.

MR. YONG: May I intercede or give my opinion?

THE COURT: Sure.

MR. YONG: I think that the way to go about this is basically to go back into treatment with Dr. Keller.

THE COURT: I liked Dr. Keller when he was here. He made a good impression on me.

MR. YONG: And I think there's a level of trust and treatment that was provided by Dr. Keller in an ongoing kind of relationship that's not present with Dr. Ortega.

THE COURT: The problem with Dr. Keller was you couldn't coordinate your hours.

THE DEFENDANT: Yeah, but I could do phone calls

during the middle of the day during lunch break when I'm at work.

THE COURT:  How about seeing him?

THE DEFENDANT:  I'm unable to accommodate that into my schedule because I have to work from 8:00 o'clock to 7:00 o'clock.

THE COURT:  Well, we have to try to find a way for you to actually have some one-to-one contact.  I will listen to Dr. Keller, you can call him, that's fine.  But we have to try to find a way of getting you together.  Your lawyer thinks that will be a productive way.

THE DEFENDANT:  I will do whatever it takes to accommodate you, Judge.

THE COURT:  What else do you suggest?

MR. YONG:  We see by this memorandum and the different contact we have in terms of his report back to the Court and also incorporated in the probation report that Dr. Ortega's is trying to help Mr. Eng in a therapeutic situation as a psychiatric professional who is rendering treatment has deteriorated.

THE COURT:  Why is that?  I mean, because I remember Mr. Eng felt that Dr. Ortega was a good, you know, clinician and that he was making progress with him.  Obviously, something has changed.

MR. YONG:  Yes, I think that that's true.  I don't

know if we can pinpoint what that is.  It is certainly a product of him having lost his job because of the many court dates that we've had to go to in state court as well as federal court.  But I think that he's back on course in that, in that even though the relationship between himself and Mr. Carter has never really been good.

THE COURT:  It's never going to be good but I have a feeling that Probation is never going to be able to satisfy Mr. Eng and there's always going to be tensions.

MR. YONG:  He assures me and assured the Court that he will do whatever it takes at the Court's suggestion to continue with his treatment and, you know, do whatever it takes.

I think that, in many ways, since we've had a long history in this case, that what's happening now is that he is getting what he needs in that he is able to express what he wants, he's able to express his feelings and not act out on them.

THE COURT:  That's good.  The fact that he called Dr. Ortega to say he had homicidal thoughts is a healthy way of dealing with his issues.  That's better than acting out, of course.

MR. YONG:  Of course, of course.

THE COURT:  That openness is a positive thing here.

MR. YONG:  Additionally, Judge, when the state matter was resolved, it was the feeling of the state prosecutors to basically mandate only one other thing than what he was already on and that was to have him have the injectables as a condition of the probation.  He received one year of probation which is concurrent with the three years probation he had already been on and that, you know, since that was it, they didn't require anything more.

THE COURT:  I don't know.  I mean, it's sort of like fuzzy stuff right now, there's a lot of gray areas here.

Apparently, Mr. Eng, you have good periods and then you have some relapses.  That's the overall sense I have.  I'm not a psychiatrist, obviously, right.  I'm here to sort of be the coordinator to see that you do the best you can to help you help yourself.

THE DEFENDANT:  I do have a suggestion.  I would be willing to undergo therapy at the same institution that Dr. Ortega is in except I wish to see another therapist that would accommodate a 6:00 o'clock appointment.

THE COURT:  We can try.  You can't bounce around from therapist to therapist.  We can give that a try.  If they have somebody else there, that's one possibility.  I don't know whether somebody is available or we can do that.

MR. CARTER:  I don't know, your Honor.  And that

would be problematic based on now the new therapist would have to start all over and be concerned about whether, you know, I would prefer Dr. Ortega, he's an excellent clinician and has been in the past able to work with Mr. Eng.

THE COURT: Here's a suggestion and I don't have magic answers. I'm not telling you I have all the answers to the problems in the world, if I did there would be peace in the world; I don't have that talent. But Dr. Ortega you have a long history with and I think the first instance you should try to go back to him and talk about all of these things with him.

THE DEFENDANT: Considering my relationship with him now I do not trust him at all. He has made false accusations in this report. He has been increasingly antagonistic towards me and, frankly, I'll do what you say.

THE COURT: I'm just -- see, I can't bounce you around from therapist to therapist. I don't think that's a good thing because you have to start all over again with somebody else and you could have had a bad hair day with Dr. Ortega. Maybe it could be repaired, maybe you should make the effort to do that in the first instance. These are trained professional people. His concern is the same as everybody else's: He wants you to deal with your issues and hopefully, you know, be able to live a constructive life.

But, as he says, and I think it's true,

otherwise I would not be here today, this requires a constant monitoring, constant interaction.  I feel like I'm married to you for the rest of my life in a way and I don't mind doing that.  If I could help people wearing the black robe, then I'm happy to do that.  I don't know whether I can be effective, I don't have training in this area.  And I know you have to come to court because I'm wearing the black robe.

I do hope that you're open to our continuing relationship.  There may come a time where you say I want a different judge, too.  You can't go up and down like that, we have to try to maintain our relationship even though there may be peaks and valleys and we have to smooth things over with Dr. Ortega and maybe you can see whether we can make accommodations for you to see Dr. Keller again.

Is that a good idea?

MR. CARTER:  I can contact Dr. Keller.  Again, I don't know what the telephone sessions would be --

THE COURT:  Mr. Eng has expressed a willingness to try.

You got along well with Dr. Keller I thought.

THE DEFENDANT:  Yes, I did.

THE COURT:  I remember he came to court, that was the first time he came to court.  I am impressed with the way he spoke to me and the way he reported about the issues.

So, let see whether you can line up a face-to-face session with him.  I know you're working but there are 24 hours in the day and there has to be a way of taking one hour out of the work week to see Dr. Keller. It's important for you.

THE DEFENDANT:  I really don't know how I'm going to accommodate that I'm probably going to lose my job because of this.

THE COURT:  I don't think so.  Now, if you would like me to call your employer to tell them that you have to have, you know, time off from, let's say, 5:00 o'clock to 6:00 o'clock on a Thursday or a Wednesday, I don't think that they would fire you.

THE DEFENDANT:  Actually, I could leave work at 5:00 if he wanted to meet but Dr. Keller does not have hours after 5:00 and neither does Dr. Ortega.

THE COURT:  You never run the risk of losing your job because you must have medical supervision.  You must have it, that's the bottom line.  I don't see where they are necessarily mutually exclusive.  I will be happy to talk to your employer but I don't think it's necessary.

I can't imagine that you would get fired because you have to tell your employer you have a medical need to take care of at 5:00 o'clock every Thursday or whatever.  Dr. Keller does see people at 5:00 o'clock, I

know that.

THE DEFENDANT:  He told me otherwise but I will check to make sure.

THE COURT:  I know he sees people, you see whether he can do that.  I would much rather have you do that than have to have you placed in some sort of daycare situation where you're there all the time because then certainly you won't be working, right.

THE DEFENDANT:  Yes.

THE COURT:  Let's try to do this instead of that, that makes sense.  I want you to go see Dr. Ortega, line up a meeting with Dr. Keller and if you need me to speak to your employer to make my best efforts to make sure that you will not be retaliated against because you're seeking -- you have to attend a medical appointment once a week I will be happy to do that.

THE DEFENDANT:  Yes, I would like that.

THE COURT:  You speak to Dr. Keller and find out when you can see him and I'll call your employer if you like and I will just say that we need them to accommodate you because it's important that you have some medical attention. I won't go into details and we'll see what we can all work it out together.

In the meantime, you are continuing to take your medication and the injections I understand.

THE DEFENDANT:  Yes, I have to take an injection today as a matter of fact.

THE COURT:  You are doing a good job on certain levels but you still have these issues which we always have to pay attention to.

It seems like you're making some progress, tell me about your new job.

THE DEFENDANT:  It's at Madison Publishing.  I work in inside sales, I sell subscriptions to their services.

THE COURT:  Is it coming along okay?  Have you been there a little while?

THE DEFENDANT:  I haven't started, it starts on Monday.

THE COURT:  You're not going to lose your job, you haven't started the job.  You let me know if you want me to talk to them or you want me to wait a week and see if you can work things out yourself first.

THE DEFENDANT:  Yes.

THE COURT:  Let's try that.  You can talk to them that you're looking forward to working.  I will work late at night, whatever it is, but you say you have to carve out that one hour a week for medical purposes and I'm sure they'll accommodate you.  If not, I will speak to them.

MR. YONG:  It will probably be two hours.

THE COURT: Two hours, whatever the time is. I think also your lawyer has done an excellent job caring for the situation. He can contact your employer, also. He can speak to him, speak to your employer to suggest that we need to have these two hours.

Mr. Yong, you can hopefully intercede in that respect and see how it goes.

THE DEFENDANT: One more thing. Are we done with this first issue?

THE COURT: What else do you want to say.

THE DEFENDANT: I wanted to bring up the issue regarding the complaint I have against Officer Drelovic and Officer Keller.

THE COURT: I spoke to them and they're aware of the fact that you are concerned about it. Hopefully things will be better in the future. I'm not going to fire the probation department, I can't do that. And I'm not going to do that.

I am aware of your concerns and the way to deal with this is that you need to open up and talk about it and hopefully things will get better. It's the best we can do, all right?

THE DEFENDANT: Okay.

MS. CHEN: I appreciate everything, the sensitivity, the nuance with which you're dealing with the

situation.  Given that Mr. Eng is in limbo about his therapy and the fairly serious comments by his therapist, I ask that we reconvene in a couple weeks and not let it go on.

THE COURT:  We should get together again in a couple of weeks because we have to make sure there is a proper hookup with Dr. Keller, Dr. Ortega, and everything that we talked about and we are making a record so we can be guided by what we said in court and there may well be, Ms. Chen, that you can get a copy of what we said in court today to Dr. Ortega and Dr. Keller so they're kept in the loop because a lot of times communication, you know, passes by without being hooked up and it's best that they actually read what we said today so they know where we're coming from that's a good idea.  Get a copy of this and send it over to Dr. Ortega and Dr. Keller.

MS. CHEN:  I will do that, your Honor.

The second request I have Mr. Eng's former employment at law.com as reported in Mr. Carter's probation report.  Mr. Eng no longer has that job.  Mr. Eng has never agreed to allow Probation to speak with his employers directly or confirm his employment which is not the issue I'm raising at this moment but it does seem to me relevant, your Honor, to find out the circumstances under which he lost his job to the extent they relate to any kind of behavioral/interaction issues with the community.

THE COURT:  Here's what I'm going to suggest, all right?  I want Mr. Eng to share that information with Dr. Keller and Ortega.  I think it's best if it went from you to the therapist.

MS. CHEN:  My concern, your Honor, is that Mr. Eng has reported to Probation that the reason he lost his job is because he has to meet all these different appointments.  I think, unfortunately, there's a history on Mr. Eng's part to blame other individuals or circumstances and I think it's important for the Court and for us, in trying to decide how to address Mr. Eng's various issues, to know the truth about or at least the employer's side as to why they released him.

THE COURT:  All right that's a fair request.

MR. YONG:  I have an e-mail that was given to Mr. Eng concerning his leave from the job which I can share with the Court and Ms. Chen.

THE COURT:  Let's hear it.

MR. YONG:  I will give it to the Court.

THE COURT:  Just read it.

MR. YONG:  Okay.

THE COURT:  We want to make a record.

MR. YONG:  Certainly.

Kenneth, thank you for coming by to speak to me.  I truly appreciate your honesty and efforts and it is best that we let you go.

THE COURT:  This is from the past employer?

MR. YONG:  This is a past employer.

THE COURT:  Okay.

MR. YONG:  This is date 8/10 of 2011.  And I'll pick up from where I left off.

I think it is best that we let you go as the situation does not allow any more absences.  Please mail back your employee I.D., it is the policy of the building. I will make sure the payment for these days of work is sent to your bank account as soon as possible.

I wish you the best with everything.  Yours sincerely, Kseniya Dzigaua, the COO of laws.com with relevant numbers.

THE COURT:  You are absent a lot.  Even if you saw Dr. Ortega once a week, it doesn't mean that you will be fired from that.  And, once again, I am not going to find out why you were absent a lot.  I don't think you were seeing Dr. Ortega all the time.

THE DEFENDANT:  No, Dr. Ortega had nothing to do with it.  What happened was I had to see Probation and go to Court twice every month and that was too much for her to handle.

THE COURT:  Really?  Well, do you want me to call them and ask them that?  I don't understand, you only come here once a month.

MR. YONG:  He had to go to the state court judge and that was going on to trial.

THE COURT:  Once again, Mr. Yong, you'll communicate with the employers and share with them the fact that he has his obligations.  Perhaps if you would have done that with his prior employer he wouldn't have been discharged.

THE DEFENDANT:  I didn't think it was fair to my employer.

THE COURT:  Look.

MR. YONG:  We'll do the best we can, Judge.

THE COURT:  You can't use your obligations here as an excuse for your problems.  You can't do that, because if it's a problem I'll have to put you in confinement and I don't want to do that.  You know I don't want to do that, so don't put me in that type of paradoxical situation because I'll have no alternative.

Mr. Yong is very good, I'm married to him for life, also.  He's caring and he's trying to help.  You must be interactive, Mr. Yong, knowing his problems as you do and you can talk to his employer.

MR. YONG:  Yes.

THE COURT:  All right.

MR. YONG:  Very well.

THE COURT:  But it doesn't seem as if the employer

was hostile to you and it seems that you can maintain employment.  You seem to get jobs and you have to work it out.

I would suggest to you that with your new employer you can say that you need a couple of hours off a week, that's not unreasonable, and that you'll compensate by working late at night or making it up on the weekends. There are ways in which people work out their differences.

THE DEFENDANT:  I can do that.  I would like to point out that Ms. Chen accusing me of blaming people for my problems has absolutely no basis.

THE COURT:  I understand that, you are defensive about this.  I understand that, I hear that all the time. Nonetheless, they have their view of things, you have your view of things, that's the way it is, okay?  We have to see that.

And everyone has different perceptions and different reactions.  I'm concerned about your continued mental health, that's all I'm concerned about, okay?  So, I think we made some focused progress today and let's get back together as soon as we can but I'm going to be, the last day I'm going to be here is going to be, I think, September 26th and then I'm going to go away for two weeks.  I think I deserve a vacation.

MR. YONG:  Yes, you do, Judge.

THE COURT: Maybe the 26th would be a good day to come back.

MR. YONG: Yes.

MS. CHEN: That works, your Honor.

MR. YONG: Some time in the afternoon.

THE COURT: Afternoon. Mike, can we accommodate that?

COURTROOM DEPUTY: Yes. 3:00 o'clock.

Okay?

MR. YONG: Yes.

THE COURT: At that time, I'll hear some more from Dr. Ortega, you have to monitor this, and I will hear about whether there is a hookup with Dr. Keller. Again, he is a good man who I would like to see. We will have to know more about the employment situation, Mr. Yong, you know, with the efforts that have been made to make sure that Mr. Eng's employer knows that he needs to leave a couple hours a week or whatever. You work it out with him and you let me know how it all works out.

MR. YONG: Hopefully, I will contact them the Friday before the court date.

THE COURT: Okay, Mr. Eng, keep up the good work.

COURTROOM DEPUTY: 3:30 on the 26th instead of 3:00 o'clock.

MS. CHEN: Fine.

COURTROOM DEPUTY:  Is that okay?

MR. CARTER:  Yes, it is.

THE COURT:  Okay.  Mr. Carter, thank you very much.  Ms. Chen thank you very much.

MS. CHEN:  Thank you.

MR. YONG:  Thank you.

COURTROOM DEPUTY:  Thank you.

(WHEREUPON, the proceedings were adjourned to September 26, 2011, at 3:30 p.m.)

*    *    *

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

_____
Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter